1

2

3

4                          UNITED STATES DISTRICT COURT

5                       NORTHERN DISTRICT OF CALIFORNIA

6

7    PABLO MENDOZA, JR.,                    Case No.  22-cv-04094-AMO (PR)

8                  Petitioner,              **ORDER DENYING PETITION FOR**
                                            **WRIT OF HABEAS CORPUS; AND**
9           v.                              **DENYING CERTIFICATE OF**
                                            **APPEALABILITY**
10   BRIAN CATES, Warden,

11                 Respondent.

12          Petitioner Pablo Mendoza, Jr., a state prisoner currently incarcerated at the California

13   Correctional Institution, represents himself in the instant  habeas action under 28 U.S.C. § 2254

14   challenging the validity of his state court conviction and raising multiple claims.

15          On May 9, 2019, an Alameda County jury convicted Mendoza of first-degree murder and

16   the jury also convicted his codefendant, Brandon Follings,[1] of first-degree murder.  *People of*

17   *California v. Mendoza*, No. A157489, 2021 WL 302739, at *4 (Cal. Ct. App. Jan. 29, 2021).  The

18   victim, Daniel DelToro, was shot and killed on July 19, 2017 in Union City.  *Id.* at *2-3.  The jury

19   found both Mendoza and Follings guilty of first-degree murder and possession of a firearm by a

20   convicted felon, and it found true all related special circumstances.  *Id.* at *4.  The jury also found

21   true several enhancements and special allegations, including that the crime was committed for the

22   benefit of a criminal street gang and that DelToro had been intentionally killed because he was a

23   witness to a crime.  *Id.*  Mendoza was subsequently sentenced to life in prison without the

24

25   _____

26   [1] Follings filed a federal habeas action which was assigned to the Honorable Judge Charles R.
     Breyer.  *See* Case No. 22-cv-03785-CRB (PR).  Unlike Mendoza, Follings claims that: (1) his due
     process rights were violated when he was not allowed to sever his case from Mendoza's; and (2)
27   the evidence adduced at trial was insufficient to support his conviction for first-degree murder as
     well as the finding and imposition of the gang enhancement allegation against him.  *See* Dkt. 12 at
     2 in Case No. 22-cv-03785-CRB (PR).  On November 21, 2023, Judge Breyer denied Follings's
28   petition as to both claims.  *See* Dkt. 21 in Case No. 22-cv-03785-CRB (PR).

1  possibility of parole plus twenty-five years to life. *Id.*

2      Having read and considered the papers filed in connection with this matter and being fully

3  informed, the Court hereby **DENIES** all claims in the petition for the reasons below.

4  **I.      FACTUAL AND PROCEDURAL BACKGROUND**

5      The California Court of Appeal summarized the facts of Mendoza's offense as follows.

6  *See Mendoza*, 2021 WL 302739, at *1-12. This summary is presumed correct. *See Hernandez v.*

7  *Small*, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002); 28 U.S.C. § 2254(e)(1).

> **I.      FACTUAL AND PROCEDURAL BACKGROUND**
>
> In December 2017, an information was filed by the Alameda County District Attorney, charging Mendoza, Brandon Follings, and Valeria Rose Boden in count one with DelToro's murder. (Pen. Code, § 187.) [FN 1] With regard to count one, the information alleged that both Mendoza and Follings personally and intentionally discharged a firearm which proximately caused great bodily injury and death (§§ 12022.5, subd. (a), 12022.53, subds. (b)-(d), (e)(1) & (g)), doing so for the benefit of a criminal street gang (§ 186.22, subd. (b)(5)), and that the charged murder was a serious felony (§ 1192.7, subd. (c)) and a violent felony (§ 667.5, subd. (c)). The information further alleged a special circumstance that the murder was committed against the witness to a crime. (§ 190.2, subd. (a)(10).) Counts two and three charged Follings and Mendoza, respectively, with possession of a firearm by a felon. (§ 29800, subd. (a)(1).) Mendoza was alleged to have sustained two prior felony convictions. Certain additional enhancements were alleged with respect to Boden and Follings. Prior to trial, Boden's matter was severed from that of Mendoza and Follings.
>
> [FN 1:] All statutory references are to the Penal Code unless otherwise specified.
>
> Jury trial with respect to Mendoza and Follings commenced on April 17, 2019. The following facts were adduced at trial.
>
> **A. Prosecution Evidence**
>
> *i. Kennedy Park Shooting & Prosecution*
>
> In 2008, four members of the Decoto XIV (Decoto) gang—Noel Cruz, Raymond Romo, Damien Alaniz, and Joe Perry—attempted a robbery in Kennedy Park, an area claimed as Decoto territory in Union City. When the victims resisted, the gang members shot them both, killing one and injuring another. The case remained unsolved for several years.
>
> In 2011, DelToro, a member of the Decoto gang, was arrested for committing an unrelated felony. In response to questioning by Union City detectives, DelToro identified Cruz, Romo, Alaniz, and Perry as

2

the individuals involved in the Kennedy Park incident. The surviving victim corroborated this story by identifying one of the named gang members as one of his assailants. DelToro dropped out of the Decoto gang and testified for the prosecution at the preliminary hearing. Cruz, Alaniz, and Romo all pleaded guilty and were sentenced to lengthy prison terms. Romo received an 11-year sentence for his role in the shooting. Perry proceeded to trial and was convicted as a result of DelToro's trial testimony.

Following the trial, detectives learned that DelToro had been identified on a "bad news list," a hit list of former gang members who had dropped out or "snitched" and were no longer in good standing with the gang. Bad news lists prescribe gang retribution, including beatings, stabbings, and murder. In exchange for cooperating with the Kennedy Park prosecution, DelToro received a reduced sentence of six years, served in local jail to help protect him from possible retaliation.

### ii. Murder of DelToro

On the afternoon of July 19, 2017, law enforcement officers responded to a 911 call of gunshots in Union City. The officers found DelToro unresponsive and bleeding, with an overturned stroller nearby and a woman holding DelToro's infant son. The woman had run outside after hearing the gunshots to check on the baby. DelToro had suffered six entry gunshot wounds to his chest, back and thighs. He was pronounced dead at the scene.

A neighbor testified that she heard gunshots, saw DelToro on the ground, and called 911. Her husband saw a car with a driver and at least two passengers. Another individual wrote a partial license plate number of the vehicle on a trash can nearby. Using surveillance footage and the partial license plate number, sheriff's deputies determined that a vehicle matching the description was registered to Boden's grandmother in Alameda. Boden was arrested and eventually cooperated with the investigation.

Boden testified against Mendoza and Follings at trial pursuant to a plea deal in which she received a six-year prison term in exchange for her truthful testimony. Boden had been romantically involved with Follings in 2017. She owned an illegally purchased firearm, a 9mm Llama, that she gave to Follings about two weeks before the shooting. Follings, a member of the North Side Oakland gang, was friends with Mendoza.

On July 19, 2017, Boden drove her grandmother's Toyota Camry to Mendoza's house at Follings's request. Follings then asked Boden to drive him and Mendoza to buy marijuana at a nearby house. On the way, Mendoza saw DelToro walking down the street pushing his infant son in a stroller. Mendoza became irritated and explained that DelToro was a snitch. Mendoza said he wanted to "fire on" DelToro, which Boden understood to mean he wanted to fight DelToro. Boden said she did not think they should fight him while he was with his baby and Mendoza agreed. She drove them back to Mendoza's house.

After Mendoza exited the car, Follings asked Boden to drive around

3

the block to see where DelToro was going, stating: "You're not supposed to ever give a snitch a chance to tell again." Boden was afraid but did not refuse because Follings was "not the type of person you say 'no' to." After noting DelToro's location, Boden drove Follings back to Mendoza's house.[FN 2] Mendoza got back into the vehicle carrying socks and a pair of jeans. Follings repeated that you should "never give[ ] a snitch a chance to tell again."

[FN 2:] According to Mendoza's mother, she heard and saw Mendoza and Follings going in and out of her house that day. At one point, she heard them in the backyard whispering: "Fuck that, fuck that." She heard shots some 15-20 minutes later.

According to Boden, as she drove past DelToro, Mendoza told her to stop and began exiting the car. With socks on his hands, Mendoza pointed a gun at DelToro. DelToro stopped pushing the stroller, put his hands in the air, and screamed, "My son, my son." The gun did not fire, and DelToro fought Mendoza for control of the weapon. Mendoza yelled to Follings: "Kill him, kill him." Follings got out of the car armed with a gun and fired multiple shots at DelToro. Boden picked up Follings and Mendoza and drove them back to Mendoza's house. Mendoza was bleeding from his arm and accused Follings of shooting him. Follings apologized and said it was not intentional. Boden left the two at Mendoza's house and drove away.

Boden was arrested the night of the murder. Sheriff's deputies located Follings and placed him under arrest on August 4, 2017. Mendoza was arrested on August 17, 2017, when he reported to his probation officer. He had an apparent gunshot wound to his arm. Mendoza's mother was interviewed that day by detectives and reported that Mendoza had told her he and DelToro got into a fight when DelToro tried to take his gun and so Follings shot and killed DelToro. DNA from blood at the crime scene was matched to Mendoza's DNA. The surveillance video obtained by the police was played at trial. The video showed Mendoza with a gun, his struggle with DelToro, and Follings shooting his gun at DelToro.

### iii. Gang Expert Testimony

Officer Gabriel Urquiza testified as a gang expert concerning the North Side Oakland gang (NSO or Ice City gang) and its subsets, including the Bushrod gang. He opined that the NSO/Bushrod gang was a criminal street gang and that Follings was a gang member. Urquiza testified that a music video made of Follings's rap song "On My Job"—in which both Follings and Mendoza appear—announced an alliance between the Ice City and Decoto gangs by spelling out the words "Ice City to Decoto." In response to a hypothetical in which an NSO gang member and a Decoto gang member form an alliance, then see a snitch on the street and murder that snitch, Urquiza opined that the murder would be committed for the benefit of both gangs because the reputations of both individuals and both gangs would be elevated by their willingness to commit a violent act against the snitch. Urquiza testified as to certain predicate offenses committed by the NSO gang.

Detective Andrew Gannam testified as a gang expert concerning the Decoto gang. He described characteristics of the Decoto gang and

United States District Court
Northern District of California

testified that he had personally obtained DelToro's statement incriminating Decoto gang members in the Kennedy Park shooting. He opined that Mendoza was a member of the Decoto gang. Detective Victor Ramirez also testified as a gang expert regarding the composition, characteristics, and activities of the Decoto gang. Based on his review of the "On My Job" music video, he opined that Mendoza and Follings had formed an alliance and that gang members fortify such alliances by committing crimes. In response to a hypothetical mirroring the facts of the instant offense, Ramirez opined that both gang members who participate in the murder of a snitch, as well as their respective gangs, would benefit from enhanced reputations for violence. He also testified about certain predicate offenses committed by the Decoto gang.

**B. Defense Evidence**

Follings testified in his own defense. In 2010, he was convicted of robbery and sentenced to seven years, eight months in prison. Following his release, he experienced some success in his gangster rap career. He met Mendoza through their shared interest in music. Part of his rap music included claiming the neighborhood of Bushrod Park and playing a persona rather than his real self. He denied ever belonging to a gang and stated he had not known Mendoza to associate with Decoto gang members. Follings had never heard of DelToro but when they drove by him on the day of the shooting, Mendoza identified him as a snitch. When they drove by DelToro again, Mendoza pulled a gun. He did not know Mendoza was armed but assumed DelToro was. Boden gave Follings the gun from her purse. He watched Mendoza and DelToro struggle over Mendoza's gun and heard Mendoza say "Help, B, help." He got out of the car, heard a shot go off, and repeatedly shot DelToro because he "didn't want to get shot."

Mendoza elected not to testify. During closing argument, his defense counsel stressed that Mendoza's gun was never fired. He argued that it was reasonably possible from the evidence presented that Mendoza only wanted to confront, frighten, and fight DelToro, not kill him.

**C. Conviction and Sentence**

On May 9, 2019, the jury found Mendoza and Follings guilty of first-degree murder and possession of a firearm by a felon and found true all related special circumstances, enhancements, and special allegations. On June 6, 2019, Mendoza was sentenced to life in prison without the possibility of parole (LWOP), plus 25 years to life with respect to count one. Certain enhancements related to that count were stayed. As to count two, the court sentenced Mendoza to the upper term of three years, to run concurrently with the sentence on count one. The court additionally imposed restitution obligations and various fine, fees, and assessments as discussed further below. Mendoza's timely notice of appeal followed.

*Mendoza*, 2021 WL 302739, at *1-4.

## II.    POST-CONVICTION APPEALS

On January 29, 2021, the California Court of Appeal denied Mendoza's direct appeal upon finding no prosecutorial error and that the trial court did not abuse its discretion in allowing gang expert witness testimony (among other claims that were not raised in the instant petition). *See* Resp't Ex. D; *Mendoza*, 2021 WL 302739, at *1-12. On March 1, 2021, Mendoza filed his petition for review. *See* Resp't Ex. E. On April 14, 2021, the California Supreme Court denied review. *See id.*; Dkt. 12-13 at 53. Nowhere in the record does it show that Mendoza pursued collateral review in state court.

## III.    FEDERAL COURT PROCEEDINGS

On July 13, 2022, Mendoza filed the instant federal habeas petition. Dkt. 1. This case was first assigned to the Honorable Magistrate Judge Virginia K. DeMarchi. *See* Dkt. 6. After Respondent declined magistrate judge jurisdiction (*see* Dkt. 8), the case was reassigned to the Honorable Judge Jon S. Tigar before it was subsequently reassigned the undersigned judge. *See* Dkts. 10, 20. In her November 30, 2022 Order to Show Cause, Magistrate Judge DeMarchi found Mendoza's two claims for habeas relief – (1) improper vouching by the prosecutor during opening and closing statements and (2) expert testimony interpreting a rap song as showing motive and intent violated his rights to a fair trial and due process – cognizable. Dkt. 6 at 2.

## IV.    LEGAL STANDARD

A petition for a writ of habeas corpus is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). The Court may entertain such a writ petition "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he [or she] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A district court may not grant a petition challenging a state conviction on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1); or "(2) resulted in a decision that was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2).

To determine whether a state court ruling was "contrary to" or involved an "unreasonable application" of federal law under subsection (d)(1), the Court must first identify the "clearly established Federal law," if any, that governs the sufficiency of the claims on habeas review. "[C]learly established" federal law consists of the holdings of the United States Supreme Court that existed at the time the petitioner's state court conviction became final. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Harrington v. Richter*, 562 U.S. 86, 102 (2011). A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." *Williams*, 529 U.S. at 405-06. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000). Moreover, "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

On federal habeas review, AEDPA "imposes a highly deferential standard for evaluating state-court rulings" and "demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks omitted). In applying the

7

1    above standards on habeas review, the Court reviews the "last reasoned decision" by the state

2    court.  *See Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004).

3        When there is no reasoned opinion from the highest state court to consider the petitioner's

4    claims, the court looks to the last reasoned opinion.  *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06

5    (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000).  Thus, a federal court

6    will "look through" the unexplained orders of the state courts rejecting a petitioner's claims and

7    analyze whether the last reasoned opinion of the state court unreasonably applied Supreme Court

8    precedent.  *See Ylst*, 501 U.S. at 804-06.  The last reasoned decision in this case is the state

9    appellate court's unpublished disposition issued on January 29, 2021, which relates to Mendoza's

10   claim that that trial court improperly allowed expert testimony interpreting his rap song.  *See*

11   *Mendoza*, 2021 WL 302739, at *6-8.  Meanwhile, as further explained below, the state appellate

12   court did not address the merits of the prosecutorial misconduct claim on direct appeal because it

13   found that Mendoza had forfeited his claim of misconduct when his trial counsel failed to

14   contemporaneously object at trial.  *See Mendoza*, 2021 WL 302739, *8-10.  Mendoza presented

15   his claim of prosecutorial misconduct to the California Supreme Court in the petition for review,

16   and the state supreme court summarily denied review.  *See* Resp't Ex. E.

17       If constitutional error is found, habeas relief is warranted only if the error had a

18   "substantial and injurious effect or influence in determining the jury's verdict."  *Penry v. Johnson*,

19   532 U.S. 782, 795 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993)).

20   **V.    DISCUSSION**

21       Mendoza raises the following claims for federal habeas relief: (1) prosecutorial misconduct

22   stemming from improper vouching by the prosecutor during opening and closing statements; and

23   (2) expert testimony interpreting a rap song as showing Mendoza's motive and intent to kill.

24   Dkt. 1 at 3-4.[2]  In her November 30, 2022 Order to Show Cause, Magistrate Judge DeMarchi

25   found both claims cognizable.  *See* Dkt. 6 at 2.  The Court will evaluate each claim in turn.

26

27

28   [2] Page number citations refer to those assigned by the Court's electronic case management filing
     system and not those assigned by the parties.

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

### A.    Prosecutorial Misconduct

#### 1.    Background

In his petition, Mendoza claims, "[t]he Prosecutor erred in opening statement and closing argument by vouching [and] injecting his personal views into the case and inviting an emotional response to the evidence." Dkt. 1 at 3. Mendoza made substantially the same argument on direct appeal. *See Mendoza*, 2021 WL 302739, at *8. However, as mentioned, the state appellate court held Mendoza forfeited his claims of misconduct because his trial counsel "did not object to the prosecutor's lines of questioning or his opening or closing argument." *Id.* at *9. The California Supreme Court denied review. *See* Dkt. 12-13 at 53.

#### 2.    Mendoza's Direct Appeal and Resulting State Court Opinions

##### a.    State Appellate Court's Finding That Claim Is Forfeited

The state appellate court summarized Mendoza's prosecutorial misconduct claim and found it to be forfeited, stating as follows:

> *i. Additional Background*
>
> Mendoza contends that the prosecutor erred throughout the trial by vouching for witnesses, injecting his own opinion, and inviting an emotional response from the jury, all amounting to a violation of his due process rights. With respect to the prosecutor's opening statement, Mendoza points to comments that "this case is about the worst gang violence you could ever hear of." He faults the prosecutor for characterizing the police response as an "incredible investigation" and "[g]ood, hard police work." He claims it was improper for the prosecutor to indicate that he interviewed Boden twice, at one point telling her: "You need to be honest. You can't lie. You gotta tell me everything. This is gonna be recorded." He also contends that the prosecutor narrated what he saw while playing the surveillance video of the homicide in his opening statement, and therefore what the jury should see.
>
> During the trial itself, Mendoza claims that the prosecutor improperly elicited a narration of the homicide video and questioned an officer in a way that indicated the two of them had watched the video together and were consistent in their interpretation of it. Finally, Mendoza claims the prosecutor erred in his closing argument by stating that "there is an element in our society that's just evil. That's just bad. Just doesn't care about life. Doesn't care about other people." And he challenges the prosecutor's statements that "gang violence is out of control in our society" and that the "gang violence mentality" is to "do what you want whenever you want."

9

*ii. The Claims are Forfeited*

"The standards governing review of misconduct claims are settled. 'A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such '"unfairness as to make the resulting conviction a denial of due process." (*People v. Katzenberger*, 178 Cal.App.4th 1260, 1266 (2009).) "'Prosecutorial misconduct that falls short of rendering the trial fundamentally unfair may still constitute misconduct under state law if it involves the use of deceptive or reprehensible methods to persuade the trial court or the jury.'" (*People v. Jablonski*, 37 Cal.4th 774, 835 (2006).)

However, "[m]isconduct that does not constitute a federal constitutional violation warrants reversal only if it is reasonably probable the trial outcome was affected." (*People v. Shazier*, 60 Cal.4th 109, 127 (2014).) Moreover, "'a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety," where such a request would not have been futile. (*People v. Stanley*, 39 Cal.4th 913, 952 (2006); *People v. Hill*, 17 Cal.4th 800, 820 (1998) (*Hill*).) "The reason for this rule, of course, is that 'the trial court should be given an opportunity to correct the abuse and thus, if possible, prevent by suitable instructions the harmful effect upon the minds of the jury.'" (*People v. Williams*, 7 Cal.App.5th 644, 682 (2017) (*Williams*).)

It is "improper to make arguments to the jury that give it the impression that 'emotion may reign over reason,' and to present 'irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role, or invites an irrational, purely subjective response.'" (*People v. Vance*, 188 Cal.App.4th 1182, 1192 (2010).) A prosecutor should also avoid improper vouching—"an attempt to bolster a witness by reference to facts outside the record." (*People v. Huggins*, 38 Cal.4th 175, 206 (2006).) "Nor may prosecutors offer their personal opinions when they are based solely on their experience or on other facts outside the record." (*Id.* at p. 207.)

Advocates, however, "are given significant leeway in discussing the legal and factual merits of a case during argument." (*People v. Centeno*, 60 Cal.4th 659, 666 (2014).) "'The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom.'" (*Hill*, supra, 17 Cal.4th at p. 819.) When a claim of misconduct "focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Samayoa*, 15 Cal.4th 795, 841 (1997).)

We need not determine whether the prosecutor's conduct rose to the level of misconduct under the standards here articulated because, as Mendoza acknowledges, defense counsel did not object to the

prosecutor's lines of questioning or his opening or closing argument.[FN 4] Further, nothing in this record indicates an objection would have been futile or that curative action would have been ineffective, and Mendoza does not argue otherwise. We thus conclude that Mendoza has forfeited his claims of misconduct.

[FN 4:]  Mendoza asserts that there was a defense objection to the prosecutor's reference to Boden during opening argument. However, the objection was on grounds of argument, not vouching, and was made by Follings's counsel, not Mendoza's. It was therefore insufficient to preserve Mendoza's vouching claim. (*People v. Wilson*, 44 Cal.4th 758, 793 (2008) [defendant's failure to affirmatively join a codefendant's motion forfeits the issue on appeal]; *People v. Ashmus*, 54 Cal.3d 932, 976 (1991) [objection without an assignment of misconduct insufficient to preserve issue], limited on an unrelated point as stated in *People v. Yeoman*, 31 Cal.4th 93, 117 (2003).)

Mendoza suggests that we exercise our discretion to nevertheless reach the merits of his misconduct arguments. (See *People v. Williams* (1998) 17 Cal.4th 148, 161-162, fn. 6 ["an appellate court is generally not prohibited from reaching a question that has not been preserved for review by a party"].) We decline to do so. Deciding whether to object is inherently tactical. (*Williams*, supra, 7 Cal.App.5th at p. 686; see also *People v. Riel*, 22 Cal.4th 1153, 1197 (2000) ["competent counsel may often choose to forego even a valid objection."].) Here, in his own closing argument, Mendoza's defense counsel began by stating: "I also sort of want to start off with the elephant in the room. The prosecutor has presented a case that has an awful lot of emotion in it. It's a lot of gang tattoos. It's a lot of crimes that aren't necessarily associated with this particular act, but they were brought in to show that there was some type of gang enhancement, some type of gang affiliation." Counsel then encouraged the jury to make a decision "based on the evidence. The evidence, not the emotion, not the tattoos, not the predicate stuff, not the baby in the baby carriage." As for Boden's credibility, defense counsel opined: "She's got a heavy bias. She's a witness that's in custody that was charged with murder that was looking at a substantial penalty. And she's getting six years from the prosecutor who had to interview her twice in order to feel comfortable that she was saying something close to the truth." Defense counsel thus appears to have made a tactical decision to forego any possible objection to the prosecutor's arguments in favor of reasoned argument.

As for Mendoza's assertion that the prosecutor improperly inserted his own opinion into the proceedings by narrating and eliciting narration of the events depicted by the surveillance video, this is precisely the type of situation that could have been remedied by an early objection, giving the trial court the opportunity to avert any misunderstanding the prosecutor's comments might have caused. (*Williams*, supra, 7 Cal.App.5th at p. 686; see also *People v. Taylor*, 31 Cal.3d 488, 496 (1982) ["A timely objection allows the court to remedy the situation before any prejudice accrues."].) Moreover, it again appears that defense counsel did not lodge such an objection in the case because he chose to deal with the video issue in his own closing argument. Defense counsel stated: "I'm not going to play the video . . . I believe that the video speaks for itself. [¶] I've been doing

this for awhile [sic], and I know what's going to happen. You guys are going to look at the video over and over. And the 12 of you are going to go over it and somebody's going to have a different impression. . . . [¶] I'm a sport's fan . . . I'm going to watch the Warriors tonight. And no doubt somebody is going to commit a foul . . . And they're going to show the replay and it will look like a foul, but if you're a Warriors fan you're going to say, No, it wasn't a foul . . . [¶] When you look at this video, you're going to be able to slow it down. You're going to be able to go through it. I'm going to trust your judgment." It appears that counsel made a tactical decision to counteract the prosecutor's comments by his reference to "home team" bias and by urging the jury to decide the evidentiary issue for themselves. Under these circumstances, we decline to reach the merits of Mendoza's misconduct claims. [FN 5]"

[FN 5:] Mendoza asks that we consider cumulative prejudice in viewing the impact of the alleged trial errors he has asserted on appeal. However, since we have identified no errors in the proceedings below, there is nothing here to cumulate. (*See People v. Griffin* (2004) 33 Cal.4th 536, 600, disapproved on another ground as stated in *People v. Riccardi* (2012) 54 Cal.4th 758, 824, fn. 32.)

*Mendoza*, 2021 WL 302739, at *8-10.

### b. Mendoza's Petition for Review and the State Supreme Court's Summary Denial of Review

Mendoza raised a substantially similar prosecutorial misconduct claim in his petition for review, stating as follows:

Conduct by the prosecutor that so infects the trial with unfairness results in a violation of federal due process. (*People v. Earp*, 20 Cal.4th 826, 858 (1999); *Darden v. Wainwright*, 477 U.S. 168, 181 (1986); *Berger v. United States*, 295 U.S. 78, 88 (1935) [the prosecutor's duty is not to "win a case" but to see that "justice shall be done . . . . [W]hile he may strike hard blows, he is not at liberty to strike foul ones."].)

Appellant submits that the prosecutor erred throughout the trial, from the opening statement, through the evidentiary portions, and in the closing arguments, by vouching for witnesses, injecting his own opinion, and inviting an emotional response from the jury. The result was a violation of appellant's federal constitutional rights to a fair trial and due process. (*People v. Earp*, 20 Cal.4th at 858; *Darden v. Wainwright*, 477 U.S. at 181 (1986).)

Appellant contends that the prosecutor engaged in improper vouching by telling the jury that the police did an "incredible" investigation because those "incredible" police officers were witnesses in the case. Similarly, the prosecutor vouched for the credibility of the principal prosecution witness Valerie Boden when

12

he emphasized that he had personally her twice, and told her, "you need to be honest. You can't lie. You gotta tell me everything." The prosecutor also engaged in improper vouching by telling the jury that the police did an "incredible" investigation because those "incredible" police officers were prosecution witnesses. Claiming their work was incredible was tantamount to vouching for their credibility. Similarly, the prosecutor vouched for the credibility of the principal prosecution witness Valerie Boden when he emphasized that he had personally her twice, and told her, "you need to be honest. You can't lie. You gotta tell me everything." These statements, and the prosecutor's narration for the jury of what the video recording showed, amounted to the prosecutor's own opinion of the evidence, which is clearly improper. "It should go without saying that no attorney should venture a bald opinion, stated as a fact, with reference to an issue or . . . the evidence." (*People v. Nolan*, 126 Cal.App. 623, 640-641 (1932); *United States v. Kerr*, (9th Cir. 1992) 981 F.2d 1050, 1053.)

The prosecutor also erred by telling the jury that "there is an element in our society that's just evil. That's just bad. Just doesn't care about life. Doesn't care about other people;" and "gang violence [was] out of control in our society" and argued that the "gang violence mentality" was to "do what you want whenever you want." (6RT 1027, 1033.)

Dkt. 12-13 (Resp't Ex. E) at 17-19.

As mentioned, the California Supreme Court summarily denied his petition for review, which included the aforementioned prosecutorial misconduct claim. *Id.* at 53.

### 3.    Applicable Federal Law

A defendant's due process rights are violated when a prosecutor's comments render a trial fundamentally unfair. *See Darden v. Wainwright*, 477 U.S. 168, 170, 181, 183 (1986); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) (Prosecutor's remark about defendant's expectations at trial by itself was not a denial of due process.); *Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor"). However, "the appropriate standard of review for such a claim on writ of habeas corpus is 'the narrow one of due process, and not the broad exercise of supervisory power.'" *Darden*, 477 U.S. at 181 (quoting *Donnelly*, 416 U.S. at 642).

A petitioner is not entitled to habeas corpus relief in the absence of a due process violation even if the prosecutor's comments were "undesirable" or "erroneous." *Donnelly*, 416 U.S. at 642.

United States District Court
Northern District of California

1    A prosecutorial misconduct claim based on improper statements is decided "on the merits,

2    examining the entire proceedings to determine whether the prosecutor's remarks so infected the

3    trial with unfairness as to make the resulting conviction a denial of due process." *Johnson v.*

4    *Sublett*, 63 F.3d 926, 929 (9th Cir. 1995) (internal quotation marks omitted); *see Trillo v. Biter*,

5    769 F.3d 995, 1001 (9th Cir. 2014) ("Our aim is not to punish society for the misdeeds of the

6    prosecutor; rather, our goal is to ensure that the petitioner received a fair trial.").

7        Even if prosecutorial misconduct occurred, habeas relief is not available unless the

8    constitutional error had a "'substantial and injurious effect or influence in determining the jury's

9    verdict.'" *Brecht*, 507 U.S. at 637-638.

### 4.    Analysis

11        The procedural default doctrine forecloses federal review of a state prisoner's federal

12    habeas claims if those claims were defaulted in state court pursuant to an independent and

13    adequate state procedural rule. *See Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991).  The

14    Ninth Circuit has recognized and applied the California contemporaneous objection rule in

15    affirming denial of a federal petition for procedural default where there was a complete failure to

16    object at trial.  *See Vansickel v. White*, 166 F.3d 953, 957-58 (9th Cir. 1999); *see e.g., Inthavong v.*

17    *Lamarque*, 420 F.3d 1055, 1058 (9th Cir. 2005) (federal habeas challenge to the admission of a

18    confession was barred because state appellate court ruled the claim was procedurally defaulted due

19    to failure to challenge the admission of the confession at trial); *Paulino v. Castro*, 371 F.3d 1083,

20    1092-93 (9th Cir. 2004) (barring review of jury-instruction-error claim because no

21    contemporaneous objection); *Vansickel*, 166 F.3d at 957-58 (barring review of challenge to denial

22    of peremptory challenges because no contemporaneous objection).  Mendoza's failure to object

23    during trial to the prosecutor's opening or closing arguments resulted in a procedural default that,

24    unless excused, precludes federal habeas consideration of his prosecutorial misconduct claim.

25        A procedural default will be excused where a petitioner shows cause for the default and

26    resulting prejudice.  Trial counsel's ineffectiveness may excuse a procedural default, but attorney

27    error short of constitutionally ineffective assistance of counsel does not constitute cause and will

28    not excuse a procedural default.  *See McCleskey v. Zant*, 499 U.S. 467, 494, 502 (1991)

United States District Court
Northern District of California

*superseded by statute on other grounds*, 28 U.S.C. § 2244, *as recognized in Banister v. Davis*, 140 S. Ct. 1698, 1707 (2020).  Thus, to establish cause on the ground of ineffective assistance of counsel, a petitioner must show that (1) counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment, and (2) the deficient performance prejudiced the defense.  *Loveland v. Hatcher*, 231 F.3d 640, 644 (9th Cir. 2000) (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).  When deciding whether ineffective assistance of counsel constitutes cause for procedural default, AEDPA deference is not given to the state court determination on that claim; ineffectiveness of counsel is decided "de novo" under *Strickland*.  *Visciotti v. Martel*, 839 F.3d 845, 865 (9th Cir. 2016).

To serve as "cause," the claim of ineffective assistance of counsel must have been presented as an independent claim to the state courts.  *See Murray v. Carrier*, 477 U.S. 478, 489 (1986).  A procedurally defaulted ineffective assistance of counsel claim is not cause to excuse the default of another habeas claim unless the petitioner can satisfy the cause and prejudice standard with respect to the ineffective assistance of counsel claim itself.  *See Edwards v. Carpenter*, 529 U.S. 446, 451-51(2000); *Cockett v. Ray*, 333 F.3d 938, 943 (9th Cir. 2003).  Thus, to constitute cause, such a claim must be independently exhausted in state court.  *See Murray*, 477 U.S. at 488-89; *Cockett*, 333 F.3d at 943.

Here, Mendoza did not exhaust any claim of ineffective assistance of counsel because he excluded it from his petition for review before the state supreme court.  *See* Dkt. 12-13 (Resp't Ex. E) at 15-19.  Mendoza likewise does not raise such a claim of ineffective assistance of counsel in his federal habeas petition.  *See* Dkt. 1 at 3, 7.  Accordingly, his prosecutorial misconduct claim is denied as procedurally barred.

Even if Mendoza had exhausted a claim in state court that his trial attorney was ineffective for failing to object during the prosecutor's opening and closing arguments, Mendoza does not show ineffective assistance of counsel because he fails to show prejudice under *Strickland*.  The record shows that the trial court instructed the jury with CALCRIM No. 220 on the reasonable doubt burden of proof and stated that it "must impartially compare all the evidence that was

1  received during the entire trial." 6RT 1029.[3]  The trial court also instructed the jury not to "let

2  bias, sympathy, prejudice, or public opinion influence [its] decision." 7RT 1119.  Furthermore,

3  the court instructed the jury that nothing the attorneys say in their opening or closing statements or

4  questions is evidence. 7RT 1121-22.  Mendoza has provided no reason to depart from the normal

5  presumption that jurors follow the court's instructions.  *See Francis v. Franklin*, 471 U.S. 307, 324

6  n.9 (1985).  The record also shows that there existed a video recording of the killing, testimony

7  from eyewitnesses and Boden, and the handgun used was recovered and identified.  *See Mendoza*,

8  2021 WL 302739, at *3.  Mendoza thus has not shown ineffective assistance of counsel that would

9  provide cause to overcome the procedural default of his prosecutorial misconduct claim.

10  Lastly, even if the procedural default had been overcome, the prosecutorial misconduct

11  claim would fail on the merits for essentially the same reasons that any alleged claim of ineffective

12  assistance of counsel failed to excuse the default.  That is, in light of the aforementioned jury

13  instructions (including CALCRIM No. 220), the trial court's reminder to jurors that nothing the

14  attorneys say in their opening or closing statements or questions is evidence, the strength of the

15  evidence of first-degree murder, and the overwhelming amount of evidence against Mendoza, the

16  alleged prosecutorial misconduct did not have a "'substantial and injurious effect or influence in

17  determining the jury's verdict.'"  *Brecht*, 507 U.S. at 638 (1993).  Mendoza is not entitled to the

18  writ on this claim, and it is **DENIED**.

19  **B.    Admission of Gang Expert Testimony Regarding Rap Lyrics**

20  **1.    Background**

21  In his direct appeal, Mendoza claimed the expert testimony of Detective Victor Ramirez

22  regarding the rap lyrics was erroneous for two reasons.  *See Mendoza*, 2021 WL 302739, at *6-8.

23  Ramirez was cross-examined by both Mendoza's and Follings's trial counsel.  *See* 5RT  729-921.

24  First, Mendoza "argue[d] that expert interpretation of the rap lyrics at issue was improper because

25  the lyrics were sufficiently clear without the need for expert analysis."  *Mendoza*, 2021 WL

26

27  _____

28  [3] The Court refers to the numbers at the upper right hand corner of the Reporter's Transcript ("RT") pages, which is similar to how it is cited by the parties.  *See* Resp't Ex. B, Dkt. 12-4 - Dkt. 12-10.

United States District Court
Northern District of California

302739, at *6.  Respondent claims Mendoza dropped this first argument from his federal habeas petition, *see* Dkt. 11 at 18, and the Court agrees and thus does not consider it, *see* Dkt. 1 at 4.[4]

Second, citing *People v. Killebrew*, 103 Cal. App. 4th 644 (2002)[5], Mendoza also argued on direct appeal that the "expert opinion that the rap lyrics referred to DelToro was in essence improper expert testimony that Mendoza had the specific intent to kill DelToro."  *Mendoza*, 2021 WL 302739, at *6.  Mendoza substantially makes this same second argument in his federal petition, *see* Dkt. 1 at 4, which is the sole argument the Court considers.

### 2.    State Court Opinion

The state appellate court summarized and addressed Mendoza's claim relating to the alleged erroneous admission of gang expert testimony regarding rap lyrics, stating as follows:

#### i.    Additional Background

Following the conviction of Decoto gang members for their participation in the Kennedy Park shooting, Mendoza, an aspiring rap artist, recorded a song called "100 Bars Part 2." The lyrics included "'[s]houts out to Lil' Boonge'" and "'I can't wait until they let you out.'" The rap lyrics also stated, "'We gonna find that fuckin' nigga,'" and "'We gonna air his ass out. Real killas put the barrel in your mouth.'"

Detective Ramirez, who had testified as an expert witness on the structure, territory, and criminal activity of the Decoto criminal street gang, and Mendoza's membership in the Decoto gang, was asked about the song "100 Bars Part 2." After a recording of the song was played for the jury, the prosecutor asked the detective if a particular verse had any significance to him as a gang expert.

Ramirez began to explain the meaning of certain lyrics to the song. The phrase "Shouts out to Lil' Boonge" referred to Raymond Romo, who was Mendoza's friend and "one of the parties involved in the Kennedy Park homicide." The second phrase, "I can't wait until they

---

[4] While Mendoza attempts to raise this same claim—that the expert interpretation of the rap lyrics at issue was improper because the lyrics were sufficiently clear—in his traverse, the Court DENIES this claim because it was not presented in the petition.  *See Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994) (a petitioner may not raise new issues in a traverse).  The Court notes that even if Mendoza's petition had included such a claim, it is procedurally barred by the state appellate court's conclusion that the contention was forfeited by trial counsel's failure to object on such a ground.  *Mendoza*, 2021 WL 302739, at *6.  Furthermore, Mendoza did not exhaust such a contention, as he did not present it to the California Supreme Court in his petition for review.  *See* Dkt. 12-13 (Resp't  Ex. E) at 11-17.

[5] *Killebrew* was disapproved of on another ground in *People v. Vang*, 52 Cal. 4th 1038, 1047-48, n.3 (2011).

United States District Court
Northern District of California

let you out," meant that "[o]bviously, Lil' Boonge Romo is in custody right now" and "[l]iterally he can't wait for Romo to get out." The next three phrases, "We gonna find that fuckin' nigga," "We gonna air his ass out," and "Real killas put the barrel in your mouth," all "refer to Daniel DelToro." At that point, Mendoza's defense counsel objected and asked for a sidebar.

After an unrecorded discussion in chambers, the court summarized the issue before it, stating to the prosecutor "you've highlighted or isolated a particular sequence of lyrics from the video and were about to ask the witness a question about what perhaps in his opinion is the significance of those lyrics." Noting that prior testimony had established that "Lil' Boonge" was "someone who was involved in the Kennedy Park situation" and a "member of Decoto," and the evidence that Mendoza was also a Decoto member, the court concluded that the lyrics at issue "certainly seem to, well, suggest something." Mendoza's counsel objected that the opinion that "those lyrics were referring to Daniel DelToro" was prejudicial because "that's a decision for the jury, the ultimate fact." Counsel emphasized it was just too prejudicial.

The court overruled the objection, stating: "I think that the lyrics are relevant given the testimony that's been adduced. And I think the expert is allowed to give his opinion. [¶] And, [counsel for Mendoza], you can cross-examine and see what—explore perhaps to the extent that you want to. The jury is going to be instructed about their—that they don't have to accept the expert opinions. Obviously they're entitled to weigh them and assess them and in their judgment determine how much weight they should be given. So I think it's a proper subject for the expert to render an opinion on."

Detective Ramirez then gave his opinion about the meaning of the lyrics: "[Mendoza]'s giving a shout out to Raymond Romo, Lil' Boonge. [Mendoza] can't wait for him to get out. And when Lil' Boonge does get out, they're gonna find the victim, Daniel DelToro, and they're going to air his ass out, meaning that they're going to shoot him with a firearm. Bullets . . . create holes." That's where the "'air out'" reference is. And "'real killas put the barrel in your mouth.'"

On appeal, Mendoza argues that permitting expert interpretation of the rap lyrics was improper because they were not difficult to decipher and thus the jury was equally competent to understand them. He additionally asserts that the expert testimony amounted to an opinion that Mendoza was guilty, an issue which should have been reserved for the jury. We reject both claims.

*ii. Relevant Law*

While opinion testimony is generally inadmissible (*People v. Torres*, 33 Cal.App.4th 37, 45 (1995)), a properly qualified expert, with "special knowledge, skill, experience, training [or] education," may provide an opinion at trial. (Evid. Code, § 801, subd. (b).) The subject matter of such an opinion must be "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (*Id.*, subd. (a).)

As our Supreme Court has explained: "The statute does not flatly limit expert opinion testimony to subjects 'beyond common experience'; rather, it limits such testimony to such subjects 'sufficiently beyond common experience that the opinion of an expert would assist the trier of fact' (italics added)." (*People v. McDonald*, 37 Cal.3d 351, 367 (1984) (*MacDonald*), overruled on another ground in *People v, Mendoza*, 23 Cal.4th 896, 914 (2000).) A jury "need not be wholly ignorant of the subject matter of the opinion in order to justify its admission." (*Ibid.*) Rather, "even if the jury has some knowledge of the matter, expert opinion may be admitted whenever it would 'assist' the jury. It will be excluded only when it would add nothing at all to the jury's common fund of information, i.e., when 'the subject of inquiry is one of such common knowledge that [individuals] of ordinary education could reach a conclusion as intelligently as the witness' [Citation]." (*Ibid.*) We review the decision to admit expert testimony for an abuse of discretion. (*People v, Peterson*, 10 Cal.5th 409, 457 (2020).)

Gang evidence "'is admissible if it is logically relevant to some material issue in the case other than character evidence, is not more prejudicial than probative, and is not cumulative. [Citations.] . . . [¶] However, gang evidence is inadmissible if introduced only to "show a defendant's criminal disposition or bad character as a means of creating an inference the defendant committed the charged offense. [Citations]" [Citations.] . . . Even if gang evidence is relevant, it may have a highly inflammatory impact on the jury. Thus, "trial courts should carefully scrutinize such evidence before admitting it." (*People v. Coneal* 41 Cal.App.5th 951, 964 (2019) (*Coneal*).) Gang evidence is generally admissible to prove the elements of alleged gang enhancements. (People v. Vang 52 Cal.4th 1038, 1048 (2011) (*Vang*); see also *People v. Gutierrez* 45 Cal.4th 789, 820 (2009) (*Gutierrez*). In addition, evidence of gang membership is often relevant and admissible to show motive and intent to commit the charged offense. (*People v. Hernandez* 33 Cal.4th 1040, 1049 (2004) (*Hernandez*); *People v. McKinnon*, 52 Cal.4th 610, 655 (2011).)

Only a few published authorities have dealt with the admissibility of rap lyrics in a criminal trial. In *People v. Olguin*, 31 Cal.App.4th 1355 (1994), the trial court properly admitted rap lyrics written by the defendant that demonstrated his membership in a gang, his loyalty to it, his familiarity with gang culture and, inferentially, his motive and intent on the day of the killing. (*Id.* at p. 1372-1373.) In *People v. Zepeda*, 167 Cal.App.4th 25 (2008), the appellate court found no abuse of discretion in the admission of rap lyrics written by the defendant where the "lyrics, coupled with the other evidence of defendant's gang membership and his animosity towards [members of the rival gang], go beyond mere fiction to disclosing defendant's state of mind, his motives and intentions, and his fealty to furthering his criminal gang's activities." (*Id.* at p. 35; see also *People v. Johnson*, 32 Cal.App.5th 26, 60-62 (2019) [evidence of rap song written by victim admissible as evidence of the defendant's motive to kill the victim].)

Courts have cautioned against a literal reading of rap music lyrics "as statements of fact or actual intent." (*Coneal*, supra, 41 Cal.App.5th at

p. 968.) "In general, '[r]easonable persons understand musical lyrics and poetic conventions as the figurative expressions which they are,' which means they 'are not intended to be and should not be read literally on their face, nor judged by a standard of prose oratory.'" (*In re George T.*, 33 Cal.4th 620, 636-637 (2004); see also *State v. Skinner*, 218 N.J. 496, 521-522 (2014) (*Skinner*) ["One would not presume that Bob Marley, who wrote the well-known song "I Shot the Sheriff," actually shot a sheriff, or that Edgar Allan Poe buried a man beneath his floorboards, as depicted in his short story "The Tell–Tale Heart," simply because of their respective artistic endeavors on those subjects."].)

ii.      Discussion

Mendoza first argues that expert interpretation of the rap lyrics at issue was improper because the lyrics were sufficiently clear without the need for expert analysis. Mendoza failed to object in the trial court on this basis and has therefore forfeited the claim. (*Gutierrez*, supra, 45 Cal. 4th at p. 819; *People v. Partida*, 37 Cal.4th 428, 431 (2005) ["A defendant may not argue on appeal that the court should have excluded the evidence for a reason not asserted at trial."].)

Even if Mendoza had properly objected on this ground below, we would find no abuse of discretion on this record. References to "Lil Boonge" and "I can't wait until they let you out" were sufficiently beyond the jury's common experience as to be incomprehensible without an explanation that "Lil Boonge" was Romo, a member of the Decoto gang who was incarcerated for his participation in the Kennedy Park shooting based on testimony from the victim in this matter. Similarly, the reference to "that fuckin' nigga" was subject to multiple interpretations, a fact Mendoza concedes on appeal. The expert's opinion—based on his knowledge of gang psychology, the structure and activities of the Decoto gang, and the Kennedy Park shooting—provided important context about the rap lyrics in question. His testimony was therefore not inadmissible on the ground that there was no need for expert interpretation.

Citing *People v. Killebrew*, 103 Cal.App.4th 644 (2002), Mendoza also contends the expert opinion that the rap lyrics referred to DelToro was in essence improper expert testimony that Mendoza had the specific intent to kill DelToro. Mendoza asserts that it amounted to an opinion that he was guilty, a question solely reserved for the jury. This argument, however, misapprehends both the nature of the rap evidence at issue and the scope of Ramirez's expert opinion.

In *Killebrew*, the appellate court held it was error to admit expert testimony that each of the gang members in a caravan of three cars "(1) knew there was a gun in the Chevrolet and a gun in the Mazda, and (2) jointly possessed the gun with every other person in all three cars for their mutual protection. In other words, [the expert] testified to the subjective knowledge and intent of each occupant in each vehicle." (*Id.* at p. 658.) Such opinion testimony was impermissible, and because the expert testimony "was the only evidence offered by the People to establish the elements of the crime," it was the type of improper opinion "that did nothing more than inform the jury how [the expert] believed the case should be decided." (*Ibid.*) Assuming

United States District Court
Northern District of California

without deciding that *Killibrew* was correctly decided, our Supreme Court has read the case's holding "as merely 'prohibit[ing] an expert from testifying to his or her opinion of the knowledge or intent of a defendant on trial.'" (*People v. Gonzalez*, 38 Cal. 4th 932, 946 (2006) (*Gonzalez*).)

Here, however, Ramirez never testified that Mendoza had the specific intent to kill DelToro or that Mendoza was guilty of the crimes charged. He simply offered his opinion that the lyrics of Mendoza's rap song could be interpreted to mean that once Romo got out of prison, they would find DelToro and shoot him. At most, then, Ramirez's opinion about the meaning of the lyrics provided some information from which the jury could infer Mendoza's motive and intent with respect to the crimes charged. As discussed above, this was permissible testimony. (See also *People v. Gonzalez*, 126 Cal. App. 4th 1539, 1551 (2005) ["*Killibrew* does not preclude the prosecution from eliciting expert testimony to provide the jury with information from which the jury may infer the motive for a crime or the perpetrator's intent; *Killibrew* prohibits an expert from testifying to his or her opinion of the knowledge or intent of a defendant on trial."].) *Killibrew* is thus inapposite on this record.

Moreover, precedent regarding the admissibility of rap lyrics in gang cases supports the trial court's decision to admit the expert opinion here. Recently, our colleagues in Division Five considered the admission of several rap music videos featuring the defendant and other members of his gang in *Coneal*, supra, 41 Cal. App. 5th 951. The appellate court found the videos cumulative of other gang evidence. (*Id.* at pp. 966-968.) The court also rejected the prosecution's suggestion that the rap lyrics could be construed as literal statements, concluding that "[a]bsent some meaningful method to determine which lyrics represent real versus made up events, or some persuasive basis to construe specific lyrics literally, the probative value of lyrics as evidence of their literal truth is minimal." (*Id.* at p. 968.) Finally, the court found the rap videos highly prejudicial, "casually describ[ing] graphic, widespread violence" and misogyny. (*Id.* at pp. 970-971.) In sum: "[T]he rap videos had minimal probative value, either because they were cumulative of other, less prejudicial evidence, or because their probative value depended on construing the lyrics as literal statements of fact or intent without a persuasive basis to do so. This minimal probative value was substantially outweighed by the highly prejudicial nature of the violent, inflammatory lyrics, and the admission of these videos was therefore an abuse of discretion under Evidence Code section 352." (*Id.* at pp. 953-954, italics added.)

In reaching this conclusion, the *Coneal* court was careful to identify situations where rap lyrics might be admissible, stating: "We do not mean to suggest that lyrics are never probative of their literal truth. For example, where lyrics are written within a reasonable period of time before or after the charged crime and bear a sufficient level of similarity to the charged crime, their probative value as a statement of fact is increased." (*Coneal*, supra, 41 Cal. App .5th at p. 969, fn. omitted.) Other courts have reached similar results. (See *Zepeda*, supra, 167 Cal. App. 4th at p. 35 [rap lyrics properly admitted because they were not ambiguous or equivocal and were probative of

defendant's state of mind, motives and intentions, and gang loyalties]; *Olguin*, supra, 31 Cal. App. 4th at p. 1373 [rap lyrics were admissible to demonstrate defendant's gang loyalty and "inferentially, his motive and intent on the day of the killing"].)

In the present case, there is a clear nexus between the rap lyrics written by Mendoza prior to DelToro's murder and the circumstances of the charged offenses, and thus a persuasive basis exists for considering them at face value as a reflection of Mendoza's true motive and intent. As the trial court recognized, in light of the corroborating evidence in the case, the lyrics "certainly seem to, well, suggest something." For example, Boden testified that when Mendoza saw DelToro prior to the shooting, he called DelToro a snitch and said he wanted to "fire on" DelToro. She saw Mendoza go into his house and reemerge with socks that she later saw him wearing over his hands while attempting to shoot DelToro, indicating he had already formed the intent to kill DelToro before the shooting. Boden also testified that in the struggle with DelToro, Mendoza shouted, " 'Kill him, kill him.'" Substantial evidence was also admitted of Mendoza's loyalty to the Decoto gang and to Romo himself. Indeed, Mendoza does not challenge on appeal the admission of the rap lyrics themselves. We conclude the trial court did not abuse its discretion in allowing the expert to offer his opinion about the meaning of Mendoza's rap lyrics.[FN 3]

[FN 3:] We similarly reject Mendoza's constitutional claim. The "routine application of state evidentiary law does not implicate a defendant's constitutional rights." (*People v. Brown*, 31 Cal.4th 518, 545 (2003).) "'The admission of evidence results in a due process violation only if it makes the trial fundamentally unfair. [Citation.] "Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must 'be of such quality as necessarily prevents a fair trial.' [Citation.] Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose." (*Coneal*, supra, 41 Cal.App.5th at p. 972.) Here, the record is clear that the gang expert was merely asked his opinion about the meaning of the rap lyrics, and the jury was instructed that they were free to accept or reject that interpretation. We see no error, and certainly no error of a constitutional dimension.

*Mendoza*, 2021 WL 302739, at *4-7.

### 3.    Applicable Federal Law

A state court's evidentiary ruling is not subject to federal habeas review unless the ruling violates federal law, either by infringing on a specific federal constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process. *See Pulley v. Harris*, 465 U.S. 37, 41 (1984); *Jammal v. Van de Kamp*, 926 F.2d 918, 919-20 (9th Cir. 1991). Furthermore, a violation of a state procedural law does not give rise to a cognizable claim

United States District Court
Northern District of California

1    on federal habeas relief. *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) (federal habeas corpus relief

2    does not lie for errors of state law) (citing *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)).

3            The U.S. Supreme Court has never held that the introduction of allegedly prejudicial

4    evidence violates due process. *See Estelle*, 502 U.S. at 68-70. The U.S. Supreme Court has,

5    however, established a general principle of "fundamental fairness," i.e., evidence that "is so

6    extremely unfair that its admission violates 'fundamental conceptions of justice'" may violate due

7    process. *Dowling v. United States*, 493 U.S. 342, 352 (1990) (quoting *United States v. Lovasco*,

8    431 U.S. 783, 790 (1977) (due process was not violated by admission of evidence to identify

9    perpetrator and link him to another perpetrator even though the evidence also was related to crime

10   of which defendant had been acquitted)). Thus, a federal habeas court may consider whether the

11   evidence was "so extremely unfair that its admission violates 'fundamental conceptions of

12   justice.'" *Id.*

13           The admission of prejudicial evidence may make a trial fundamentally unfair and violate

14   due process "[o]nly if there are no permissible inferences the jury may draw from the evidence."

15   *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991). "Evidence introduced by the

16   prosecution will often raise more than one inference, some permissible, some not; we must rely on

17   the jury to sort them out in light of the court's instructions. Only if there are no permissible

18   inferences the jury may draw from the evidence can its admission violate due process. Even then,

19   the evidence must 'be of such quality as necessarily prevents a fair trial.' Only under such

20   circumstances can it be inferred that the jury must have used the evidence for an improper

21   purpose." *Id.* (internal citation and footnote omitted).

22           Finally, as mentioned above, state prisoners seeking federal habeas relief are only entitled

23   to relief if the constitutional trial error "'had substantial and injurious effect or influence in

24   determining the jury's verdict.'" *Brecht*, 507 U.S. at 627 (quoting *Kotteakos v. United States*, 328

25   U.S. 750, 776 (1946)). In other words, federal habeas relief is limited to constitutional error that

26   resulted in "actual prejudice." *Id*. at 637 (citation omitted).

27           **4.      Analysis**

28           As an initial matter, an expert may testify in the form of an opinion if the expert's

United States District Court
Northern District of California

1  "specialized knowledge will help the trier of fact to understand the evidence or determine an issue

2  of fact." Fed. R. Evid. 702(a).  Next, to the extent that Mendoza claims that the trial court's

3  inclusion of the gang expert testimony violated state procedural law, such a claim does not give

4  rise to a cognizable claim on federal habeas relief.  *See Estelle* 502 U.S. at 67.

5       The trial court allowed the admission of Ramirez's gang expert testimony regarding rap

6  lyrics.  The state appellate court found that the trial court did not abuse its discretion in allowing

7  Ramirez to offer his opinion about the meaning of Mendoza's rap lyrics.  *See Mendoza*, 2021 WL

8  302739, at *4-8.  As explained above, Mendoza wrote and recorded a song titled "100 Bars Part

9  2."  5RT 859.  In it, Mendoza references DelToro and Lil' Boonge, who Ramirez opined was

10  Mendoza's close friend Raymond Romo.  *Id.*  At trial, Mendoza's counsel objected to Ramirez

11  interpreting his rap lyrics, claiming "that those lyrics were referring to Daniel DelToro is

12  prejudicial in that that's a decision for the jury, the ultimate fact."  5RT 859.  The trial court

13  overruled the objection because "the lyrics are relevant given the testimony that's been adduced . .

14  . the expert is allowed to give his opinion."  *Id.*

15       In his petition, Mendoza argues, "the expert testimony interpreting a rap song as showing

16  [his] motive and intent was improper and violated his federal constitutional rights to a fair trial and

17  due process."  Dkt. 1 at 4.  Mendoza contends that Ramirez's testimony relating to "100 Bars Part

18  2" was "unsupported opinion" because there was no evidence the lyrics were about DelToro.  *Id.*

19  Specifically, Mendoza claims the expert ascribing the phrases, "We gonna find that fuckin'

20  nigga . . . we gonna air his ass out . . . and real killas put the barrel in your mouth," to DelToro

21  amounted to "improper expert opinion testimony."  *Id.*  Mendoza concludes with, "the lyrics made

22  no reference to any particular person" and therefore the lyrics are "inherently ambiguous."  *Id.*

23  Additionally, as he did in his direct appeal, *see Mendoza*, 2021 WL 302739, at *7, Mendoza

24  indicates in his traverse that he relies on *People v. Killebrew*, 103 Cal. App. 4th 644 (2002) to

25  argue an expert may not testify as to a defendant's subjective intent, *see* Dkt. 22 at 20-21.

26       Respondent points out that the state appellate court's rejection of this claim was neither

27  contrary to nor unreasonably applied any Supreme Court holding.  Dkt. 11-1 at 28.  Respondent

28  further argues as follows:

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

> Detective Ramirez's testimony was well within the permissible scope of expert testimony, as the state court explained. Exh. D at 10-13. Further, while an expert may not opine on a defendant's guilt, he may testimony on an ultimate issue to be resolved by the trier of fact. *Macdonald v. Hedgpeth*, 907 F.3d 1212, 1217 (9th Cir. 2018); *Moses v. Payne*, 555 F.3d 742, 761 (9th Cir. 2009). Here, the trial court certified Detective Ramirez as an expert in investigating gang-related crime based on his extensive experience investigating criminal street gangs. 5RT 839, 843. Based on his background and experience, Ramirez interpreted the lyrics of petitioner's song for the jury, including jargon commonly used by gang members. Detective Ramirez's opinion of the meaning of petitioner's rap lyrics did not fall outside of the permissible scope of expert testimony established by any holding of the Supreme Court, and was not tantamount to testimony concerning petitioner's intent at the time of the murder.

9   *Id.* at 29-30. The Court agrees that any due process claim related to the admission of such gang

10  expert testimony was reasonably rejected on appeal. *See Mendoza*, 2021 WL 302739, at *6-7.

11  The state appellate court reasonably found "no error of a constitutional dimension" because the

12  expert testimony was an "opinion" as to the "meaning of the rap lyrics." *See id.* at *7, n.3. The

13  state appellate court also reasonably determined that "precedent regarding the admissibility of rap

14  lyrics in gang cases support[ed] the trial court's decision to admit the expert opinion here." *Id.* at

15  *7; *see* 5RT 859 (trial court overruling objection[6] to expert's opinion on the meaning of the rap

16  lyrics at issue and finding that "it's a proper subject for the expert to render an opinion on"). The

17  state appellate court added that the jury, being informed with the expert's opinion, "was instructed

18  that they were free to accept or reject that interpretation." *See Mendoza*, 2021 WL 302739, at *7,

19  n.3.

20      The state appellate court reasonably held that the trial court "did not abuse its discretion in

21  allowing the expert to offer his opinion about the meaning of Mendoza's rap lyrics," and stated as

22  follows:

23

24

25

> In the present case, there is a clear nexus between the rap lyrics written by Mendoza prior to DelToro's murder and the circumstances of the charged offenses, and thus a persuasive basis exists for considering them at face value as a reflection of Mendoza's true motive and intent.

26

27

28  _____

[6] The Court notes that after losing the objection, Mendoza's trial counsel did not ask the expert any questions regarding the veracity of his testimony about Mendoza's lyrics. *See* 5 RT 859-882.

*Id.* at *7.  The state appellate court pointed out that "Mendoza does not challenge on appeal the admission of the rap lyrics themselves." *Id.*

The state appellate court also rejected Mendoza's reliance on *People v. Killebrew* to show that the expert opinion that the rap lyrics referred to DelToro was in essence improper expert testimony that Mendoza had the specific intent to kill DelToro. *Id.* at *6.  The state appellate court concluded that "[t]his argument, however, misapprehends both the nature of the rap evidence at issue and the scope of Ramirez's expert opinion." *Id.*  And it found that Ramirez gave "permissible testimony" because he "simply offered his opinion that the lyrics of Mendoza's rap song could be interpreted to mean that once Romo got out of prison, they would find DelToro and shoot him." *Id.*  The state appellate court found that *Killebrew* was "inapposite on this record" because it "does not preclude the prosecution from eliciting expert testimony to provide the jury with information from which the jury may infer the motive for a crime or the perpetrator's intent." *Id.* at *7 (citing *People v. Gonzalez*, 126 Cal. App. 4th 1539, 1551 (2005) (*Killebrew* prohibits an expert from testifying to his or her opinion of the knowledge or intent of a defendant on trial.)  In *Killebrew*, the defendant was convicted conspiracy to possess a firearm because members of his gang were found with a gun. *Killebrew*, 103 Cal. App. 4th at 647.  However, the prosecution's only evidence for the conviction was gang expert testimony that stated, "when one gang member in a car possesses a gun, every other gang member in the car knows of the gun and will constructively possess the gun." *Id.* at 652.  The *Killebrew* court reversed Killebrew's conviction for two reasons.  First, the court held that an expert may not offer "testimony that a specific individual had specific knowledge or possessed a specific intent," and the prosecution's evidence was therefore inadmissible. *Id.* at 658.  Second, the court determined that, having found the expert's opinion inadmissible, no reasonable jury could have found *Killebrew* guilty because there was no longer any credible evidence against him. *Id.*  Such is not the case here, and the Court finds reasonable the state appellate court's conclusion that *Killebrew* was "inapposite" because the expert did not testify that Mendoza "had the specific intent to kill DelToro." *See Mendoza*, 2021 WL 302739, at *7.  Throughout Ramirez's testimony, he was asked to interpret specific meanings of the rap lyrics.  5RT 859-863.  For instance, Ramirez testified the line "air [someone] out"

means "they're going to shoot him with a firearm" because "bullets create holes . . . that's where the 'air out' reference is." 5RT 861. Thus, while Mendoza maintains this testimony amounts to a "statement of his intent to kill," *see* Dkt. 1 at 4, the Court finds reasonable the state appellate court's ruling that Ramirez was doing no more than informing the jury the underlying meaning of Mendoza's lyrics. *See Mendoza*, 2021 WL 302739, at *7, n.3.

Finally, *assuming arguendo*, had the state appellate court found error based in the improper admission of expert testimony, this Court finds that such error would not have been prejudicial based on the overwhelming evidence presented at Mendoza's trial. At trial, the state produced ample evidence of Mendoza intent to kill DelToro, including the testimony of Mendoza's mother, who knew he had been fighting with DelToro, and Boden, who heard Mendoza refer to DelToro as a snitch he wanted to "fire on," and saw Mendoza cover his hands with socks and attempt to shoot DelToro before shouting, "Kill him, kill him," to Follings. 4RT 486, 666-67, 671-72, 679. Additional circumstantial evidence of Mendoza's intent included the fact that DelToro had been named on Mendoza's gang's "bad news list," making DelToro a target for retribution across all gangs; that Follings stated—while in Mendoza's presence—that snitches should never be given a chance to snitch again; and that Mendoza exited moving vehicle and aimed a gun at DelToro who was unarmed and walking his infant son in a stroller. 4RT 674, 678; 5RT 878, 932, 934. From this and other evidence produced at trial, it cannot be said Ramirez's testimony interpreting Mendoza's rap lyrics had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 638.

Therefore, the state appellate court's denial of Mendoza's claim relating to the admission of gang expert testimony was not contrary to or an unreasonable application of Supreme Court law. *See* 28 U.S.C. § 2254(d)(1). And even if the state appellate court had found error based on the improper admission of Ramirez's testimony, such error would not have been prejudicial based on the overwhelming evidence presented at Mendoza's trial. Mendoza is not entitled to the writ on his claim that the admission of gang expert testimony violated his right to due process. Accordingly, this claim is **DENIED**.

## VI.    CERTIFICATE OF APPEALABILITY

No certificate of appealability is warranted in this case.  For the reasons set out above, jurists of reason would not find the Court's denial of Mendoza's claims debatable or wrong.  *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Mendoza may not appeal the denial of a Certificate of Appealability in this Court but may seek a certificate from the Ninth Circuit under Rule 22 of the Federal Rules of Appellate Procedure.  *See* Rule 11(a) of the Rules Governing § 2254 Cases.

## VII.    CONCLUSION

For the reasons outlined above, the Court orders as follows:

1.    The petition for a writ of habeas corpus is **DENIED** as to all claims.

2.    A certificate of appealability will not issue.  Mendoza may seek a certificate of appealability from the Ninth Circuit Court of Appeals.

3.    The Clerk of the Court shall terminate any pending motions and close the file.

**IT IS SO ORDERED.**

Dated:  December 23, 2024

_____
**ARACELI MARTÍNEZ-OLGUÍN**
**United States District Judge**